631 So.2d 628 (1994)
Geraldine & Eddie SMITH, Plaintiffs-Appellees,
v.
STATE of Louisiana, Through the DEPARTMENT OF HEALTH & HUMAN RESOURCES, OFFICE OF HOSPITALS, Huey P. Long Memorial Hospital, Defendants-Appellants.
No. 93-691.
Court of Appeal of Louisiana, Third Circuit.
February 2, 1994.
*629 Robert S. Leake, Asst. Atty. Gen., for defendants-appellants.
Joseph Texada Dalrymple, Alexandria, for plaintiffs-appellees.
Before GUIDRY and YELVERTON, JJ., and BERTRAND[*], J. Pro. Tem.
YELVERTON, Judge.
This appeal presents the question of whether the trial judge was correct in finding that Geraldine Smith suffered damages as a result of substandard care at the Huey P. Long Memorial Hospital in Pineville, Louisiana.
Geraldine and her husband Eddie filed a petition against the state of Louisiana, Through the Department of Health & Human Resources, Office of Hospitals (DHHR), and the Huey P. Long Memorial Hospital. The DHHR operates the hospital. The plaintiffs claimed Geraldine suffered damages as the result of the improper repair of a fourth degree episiotomy. After trial, the court found in favor of the Smiths and awarded $110,000 to Geraldine in general damages and $10,000 to Eddie for loss of consortium. The DHHR appeals this judgment. We affirm.

FACTS
On June 24, 1988, Geraldine had a baby at Huey P. Long Memorial. Dr. John Grammar performed the delivery. He was completing his second year of residency in obstetrics and gynecology at the hospital. In the course of the delivery, Geraldine experienced a fourth degree episiotomy. An episiotomy is the surgical enlargement of the vulva orifice for obstetrical purposes during parturition. A fourth degree episiotomy is one in which the tear extends to the anal sphincter. Dr. Grammar repaired the tear and Geraldine was eventually sent back to her room.
Geraldine stated that several hours after she returned to her room, she went to the bathroom to take a sitz bath. Earlier they had given her some stool softeners, and when she was in the bathroom, she found she had no control of her bowels. She proceeded to clean herself up and noticed that the watery bowel movements were coming out of both her vagina and her rectum. She then got in the tub to take her bath and again the bowel movements occurred from both her vagina and rectum. The next day she went to the bathroom and the bowel movements were still coming from the vagina and rectum. She also thought she was passing gas from her vagina. She told her mother and husband about the incidents and her mother told her it was probably nothing and that she could not be doing that. She stated she never told anyone at the hospital because it was her first baby and she thought perhaps it was supposed to happen like that for a while. On the way home she had another episode in the car.
Subsequently, she returned to the emergency room of Huey P. Long Memorial on July 2, 1988. Dr. Margaret Malveaux, a resident at the hospital, examined Geraldine. Dr. Malveaux noted that Geraldine had a fistula (an abnormal passage) about one to one and one-half centimeters long between the rectum and vagina. Since it was the Fourth of July weekend, Geraldine was to come back for reevaluation. Geraldine returned to the hospital on July 7 and saw Dr. David Barnard, a staff physician at the hospital. He did an examination and noted the fistula. He then prescribed some medicine and asked her to return for a visit in two weeks to assess the state of the tissues and plan a fistula repair.
*630 That same day, July 7, Geraldine went to see Dr. Brian McCann, a general physician in private practice. Upon examination, he also found a one centimeter hole connecting the vagina and rectum three centimeters into the vagina. Dr. McCann saw her again on four occasions up to August 22, 1988. During this interval, Geraldine did not return to Huey P. Long Memorial. She and Dr. McCann discussed surgery because the fistula had not repaired itself.
Geraldine went to Huey P. Long Memorial on September 29, 1988. She was examined, the fistula was noted, and she was scheduled to return for the repair. On October 1, 1988 Geraldine was admitted as scheduled for surgery to repair the fistula. Her tissues became inflamed during the process of preparing the bowel for surgery, so she was discharged on October 3 and scheduled for readmission on October 7.
She was readmitted as scheduled. The surgery to repair the fistula was set for five days later, October 12. She did not stay to have the repair done. Geraldine checked herself out of Huey P. Long Memorial and never went back. Geraldine had the repair surgery done in March 1989 at another hospital, University Medical Center in Lafayette.

THE ISSUE
All parties agree that Geraldine suffered a fistula between her vagina and rectum. The issue is whether the fistula was caused by an incomplete repair at Huey P. Long Memorial, or came about as a result of other means not the fault of that hospital.

MANIFEST ERROR
The DHHR claims that the trial court erred in accepting the self-serving testimony of Geraldine and rejecting the medical records and objective evidence of Huey P. Long Memorial contradicting her evidence.
Citing Rosell v. ESCO, 549 So.2d 840 (La. 1989), the DHHR claims that the medical records and objective evidence show no evidence whatsoever of Geraldine experiencing these problems after the delivery of her baby on June 24. It was not until her visit to the hospital on July 2 that any evidence of symptoms or the fistula was noted. The DHHR claims that no reasonable fact finder could credit Geraldine's story that bowel movements appeared in her vagina within hours after the repair of the episiotomy. This becomes important to this case because all doctors who testified agreed that if bowel movements appeared in her vagina within hours (as opposed to days) after the repair of the episiotomy, then the repair was incomplete and it was a deviation from the standard of care not to detect the incomplete repair at the time the repair was done.
The DHHR points out certain facts which tend to show that the fistula was not due to an incomplete repair. First among these is that Geraldine never made any complaints of the problem she was experiencing to any of the hospital personnel while she was in the hospital. Geraldine admits she did not tell the hospital staff of her problems. However, her explanation was that because her mother told her that it was not possible for such a thing to happen and, this being her first baby, she had no idea what to expect, she felt that whatever was happening to her was normal and would go away. Also, when she did return to the hospital on July 2, she must have explained this to the hospital personnel, because the medical records indicate that she had been having this problem since delivery of the baby.
The DHHR argues that the medical records indicate that the perineal pad, which absorbs the postpartum discharge of lochia, showed no indication of bowel movements. It claims that since there is no sphincter muscle in the vagina to control the flow, the bowel movements would have been continuous and would have appeared on the perineal pad. On the other hand, Dr. Barnard testified that it was possible for a person to go to the bathroom, clean herself, and get back in bed on her perineal pad which would show no indication of bowel movements. He also stated that if bowel movements were found on the perineal pad, it would be difficult to tell what orifice it came from.
The DHHR further contends that Dr. Grammar and Dr. Trudi McGrath, a fourth-year medical student, both performed a rectal *631 examination on Geraldine two days after the repair of the episiotomy and neither found evidence of a fistula. However, at the time the examinations were performed, neither doctor had knowledge that Geraldine was having problems with bowel movements through her vagina, so they would not be checking for a possible fistula. Dr. McGrath stated that a rectal examination was part of a complete physical.
In his written reasons for judgment the trial judge was impressed with the sincerity of Geraldine's testimony. He found her credible and did not believe her testimony was a fabrication.
The DHHR claims that our scope of review is not limited by this finding. It argues that there is no credibility determination to be made between live testimony and a non-testifying medical chart. We disagree. Even when the evidence before the trier of fact consists solely of written reports, records, and depositions, the manifest error standard of appellate review applies. Virgil v. American Guar. & Liability Ins., 507 So.2d 825 (La.1987).
However, this case consists by no means solely of written evidence. Besides the testimony of Geraldine, her husband and her mother, the trial judge had before him the testimony of several doctors, in addition to the medical records. The trial judge also had to make a determination of whether Geraldine's story on its own was credible or not.
A trier of fact is not required to disregard testimony merely because the witness may be interested or biased. It is within the province of the trier of fact to place more probative value on the testimony of an interested witness than that of a disinterested one. Rosell, 549 So.2d at 848. In this case the trial judge placed a lot of probative value on Geraldine's testimony, finding that her testimony was not fabricated. The court then concluded that the cause of the failed episiotomy was directly related to the care she received. Based on the evidence in the record, we cannot say that it was clearly wrong for the trial judge to find that Geraldine was telling the truth when she testified she had bowel movements through her vagina within hours after the delivery of her baby.

FAILURE TO MITIGATE DAMAGES
The DHHR claims the trial court erred in refusing to take into account in the computation of damages the affirmative defenses of comparative negligence and/or failure to mitigate damages. This is based on the fact that Geraldine checked herself out of Huey P. Long Memorial in October when she was scheduled for surgery, and she did not have the surgery until the following March.
In his written reasons for judgment the trial judge stated:

Mrs. Smith suffered this embarrassing condition for some nine (9) months. Part of the time was at her own choosing, repair surgery having been scheduled in October. Testimony shows no residual physical impairments. The Court is not convinced that time and an understanding of the process will not solve many of the emotional concerns of the parties. The parties are young, committed to and supportive of each other and no testimony projects continued problems. Loss of the opportunity for future children due to this event is not carried by a preponderance of the evidence. Accordingly, the Court awards Mrs. Smith $110,000.00 in general damages and Mr. Smith, $10,000.00 in damages for loss of consortium. [Emphasis supplied.]
The above quotation shows that the trial judge, in calculating damages, took into account that Geraldine postponed surgery on her own volition, and that the postponement had no permanent ill effects. We ourselves note, based on a thorough review of this record, that Geraldine's October reluctance to stay for surgery at the hospital where she had had so many problems, can be explained. We can attribute this reluctance to her youth and lack of understanding of this unfortunate medical problem. We cannot say it was error for the trial judge to decide she was without fault.
The judgment of the trial court is affirmed. Costs of this appeal are assessed to defendant-appellant, *632 State of Louisiana, through the Department of Health and Hospitals.
AFFIRMED.
NOTES
[*] Honorable Lucien C. Bertrand, Retired, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.